Morning, Your Honor. Erika Hashimoto, director of Georgetown Law Center's Appellate Litigation Clinic, with the consent of Mr. West, who is present in the courtroom today, and with this court's permission, Miranda Card-Lampke, a third year law student in the clinic, will be presenting argument on behalf of Mr. West. We appreciate that. I think we've already signed off on that. And so thank you so much. Thank you. All right. Ms. Lampke. Good morning, Your Honors. It's a pleasure and a privilege to be here today, and may it please the court. In 2015, as the pain in Mr. West's back, feet, and knees worsened, he increasingly depended on prison officials and medical providers for care. But despite clear signs of his declining condition, the record shows that his providers invoked Wexford's cost containment policies to deny him necessary care. And they failed to excuse him from food service, where supervisors Ms. Spratt and Ms. Schultz ordered him to perform tasks that exacerbated his suffering. Viewed in the light most favorable to Mr. West, a jury could find that Wexford, its providers, and Mr. West's supervisors subjected him to unnecessary pain and constitutional harm in a violation of his Eighth Amendment rights. Turning first to Mr. West's time in food service. First, can we talk about the impact of our decision in Wade? Because I'm not sure, with the timing of the district court's order, whether there was real consideration of our embrace of the Supreme Court's final standard for this. So we also have not only that they knew, as they might have known, but that their response was also unreasonable. Can you speak to that? Yes, Your Honor. Would you like me to start with the Spratt claims or with Wexford? Let's do Spratt first. Yeah. So I think you'll see in our briefing that we did acknowledge and understand the criminal recklessness standard that this court set in Wade. When it comes to Ms. Spratt, she was trained first to understand Mr. West's medical passes. He came with a series of passes that included no standing, no prolonged standing, no pushing, pulling, or lifting over 15 pounds, and she herself said it was her job to honor the pass and to honor every bit of it. So he arrives with these passes to food service, and he also arrives cane dependent, and that is a state that four fellow food services workers also remembered. And although he came cane dependent, she in her interrogatory responses said it really wouldn't be appropriate for an inmate with a cane to be in food service at all. But she does not excuse him or request a transfer. Instead, she puts him to work, and she orders him to perform two tasks that are well outside the bounds of his medical passes and, frankly, of his obvious disability and his reliance on a cane. She ordered him routinely to lift 75 pound bags, which is well in excess of the 15 pounds. This is a task that caused Mr. West excruciating pain. It's a task that caused muscle spasms that worsened his immobility, and she also forced him to remain seated on a trash can with the lid as a cushion for many hours at a time each time she supervised him. While this might seem innocuous at first glance, she provided him with a blunt edge tool to chop the vegetables. And as he would chop the vegetables, he describes a shocking sensation that would reverberate throughout his body with each and every chop. And to make matters worse, the garbage can itself would continually collapse underneath him, causing him to fall. The other food service workers also recall his obvious suffering in this position. And throughout both of these tasks and throughout his days in food service, he would remind Ms. Spratt, and I think this is coming to your question now, of his medical accommodations as well as his pain. She alerted him to his pain. And as I mentioned, the other inmates in food service characterized his suffering as obvious. She knew all this, and yet she did not change course in any way. In fact, she mocked him, she laughed at him, and she told him, quote, I don't care what you got going on with medical. After making these statements, she persisted to force him to carry out these tasks every day that he worked under her supervision under threat of confinement. So I think it's, if you think of it in two steps, the knowledge of his medical passes and the knowledge that he relied on a cane to walk, her knowledge that he was not supposed to be in medical, I mean, excuse me, in food service in the first place with a cane, and saw indeed that he was suffering, that this was not appropriate, and did not change course for five weeks, but instead mocked him. Mr. West described it as a big joke among his supervisors. And I think that that regular acknowledgement is what rises to the criminal recklessness standard. I'm happy to turn now to Wexford. So Wexford maintained an unconstitutional customer policy in that they had a contract, which prioritized cost containment measures and cost efficiency ways in what ways would you like sites from the record is your presentation, that's okay, but that would be helpful. Because my recollection is that Mr. West says that these doctors or these medical professionals told me that, and then, of course, they get on the record, maybe deposition other submissions, and they deny that. That's right. That's where I'm at in terms of what is the right other support. So the cost containment sort of language in the contract, a jury could find that sort of the underlying incentive involved, but then from there, exactly right. Your honor. So what we see over and over and over, over the course of many, many visits and over the course of many providers in Mr. West sworn statements is that they did not rely on their own medical judgment to deny him the care. Instead, they specifically invoked Wexford's cost containment policies to deny when you say his sworn statements. I you're referring, I believe, to the first and second verified complaints. I'm referring to the doc 300 dash one and 299 dash one, which come after the first, you know, complaints. So at the summary judgment stage, we're looking at the entire record, including those sworn statements. And then there's a series of dismissals, which are right. But you mentioned his sworn statement said you mentioned the inference from their Of course, they're doing this because they're in the business of making money. I understand that. And then you mentioned sworn statement. Yes, you're referring specifically to his sworn complaints, right? Yes. Yes, that's right. What do we make of our law, which says that where you file a third complaint and then a fourth complaint, you supersede the prior complaints. And in fact, those prior complaints become a nullity. We have law, which says that when you file an amendment, what you do is you render a nullity what happened before it. And the new complaint is what is the operative complaint? What do we make of that in terms of using the verified complaint? But you're right that we would look at that if those had been the operative complaint. But where they're not, do we look at those things? So we're speaking right now, I believe, in our many, many documents. And I can confirm this in his fourth amended complaint, which was not verified, which is verified. The fourth amendment is verified? Yes, he swore to everything in that in those complaints. That's correct. So I just want to be clear. So what you're referring to when you say sworn statements, that's just his fourth amended complaint. That's for now, for these purposes, before we get to the dismissals. That's correct. Yes. All right. Go on. Continue. I'm sorry. Sure. No problem. So in the yes, that final complaint, Doc two nine nine dash one and three hundred dash one. I have the fourth amendment complaint in front of me. It's at docket entry to 13. Can you show me where it's verified? Let me check with council and come back to you. I'll tell you. So what you do is on rebuttal. Take a look and then come back up and you'll let me know. That's great. Thanks. Let's assume for the moment. It's not. OK. OK. If it's not, does that create a problem in in creating an issue of fact on this particular issue you're talking about? No, your honor, because he reports the same responses from from his providers in terms of their denial of those same. But those were related in the first and second verified the original complaint and then the first amendment to the complaint. Is that anywhere else sworn in the record that he was told by the providers as a matter of policy? Wexford prohibits me from doing X or Y. Yes, your honor. I think in each and every document, regardless of where you look in terms of his statements, you can't point me to a specific one. Sure. OK, so we've got you want two, one, three. Is that where you're hoping to? I'm asking you to tell me where I'm supposed to find what you've just told me. Sure. So we've got in. And if I don't want to put you on the spot, so if you want, when you come back on the rebuttal, then you can point me to a specific document. Yeah, I'm happy to do that. Great. Thank you. OK, and so assuming that I'm able to provide that for you, your honor, I believe I'm right in saying that regardless of where you look, he makes he reports statements such as the providers saying their hands were tied by Wexford's policy, that FDOC prohibit him from even providing more more further work passes to address the fact that he was not being supervised in accordance with those. How do we handle the fact that the different providers, nurse Blankenship, Dr. Hemphill, Dr. Wettner and nurse LaRosa all testified that Wexford did not have a policy or practice of denying treatment due to cost. And I don't believe and maybe I'm wrong, but in the record, I didn't see that there was any record evidence presented Of a, you know, of a policy or practice. That Wexford did do this outside of Mr. Wexford statements. I think there are at least two quotes that I can point you to. The first is from nurse Blankenship's deposition where she spoke about MRIs and how she rarely ever saw them go through because, quote, they show things that you wouldn't really want to see. Another provider told Mr. West that Wexford did not okay many, many treatments. So at least in those two instances, we do find some evidence outside of Mr. West's statements. I see that my time is almost up. That's a good time. Thank you. Council. Thank you. Full Cox. Good morning, and may it please the court. Caitlin Wilcox, Assistant Attorney General, on behalf of Pelley, Dianus Bratt, the district court was right at summary judgment plaintiff failed to present evidence supporting his claim and this court can affirm based on the district court's reasoning. West asserts an Eighth Amendment claim based on deliberate indifference to conditions of confinement. To succeed on his claim, West must prove an objective component that there is a substantial risk of serious harm. A subjective component that Ms. Bratt was deliberately indifferent to that risk and causation. If plaintiff fails to establish just one of these elements, his Eighth Amendment claim fails. I'd like to focus on causation. The as the causation, the constitutional violation has to cause him injury and Ms. Bratt was not working the day that Mr. West fell. That's undisputed and it's Mr. West's own medical expert who states that the only harm could have come from the day that he fell. The medical expert does not say that harm was caused from him. Chopping vegetables are seen on upside down trash can. What about the lifting of bags? Because your opposing counsel says that Ms. Bratt, among others, ordered him to lift up bags that Ms. Bratt knew that he was prohibited from doing that based on the medical order that was given and that he evinced obvious pain as testified to by others who were in the kitchen at the time. The record does not reflect that Ms. Bratt actually ever ordered him to pick up any heavy bags. If you look at his many informal and formal grievances, he never actually alleges that Ms. Bratt ordered him to carry a heavy bag. There is one that's dated July 11th, 2015, 15-510-2413, and in that he states, she stayed on the grievance about not working fast enough and not being able to carry bags of vegetables to the sink area to be washed. That's document 299-1, page 9, and this mirrors the allegation in the first and second amended complaint, which Mr. West describes Ms. Bratt as asking him to carry vegetables to the sink, and he says he had a pass. Ms. Bratt got security. Security told Mr. West just do what he can, and plaintiff was never actually made to carry vegetables. It is also mirrors Ms. Bratt's testimony that she honored these passes. So for this reason, the record does not reflect that she actually ordered him to carry these heavy bags. And Goodman-Veed. Okay, if she had ordered him to carry those bags, knowing that he had a serious medical condition, as demonstrated by his medical records, would that be a violation under the standards set forth in Wade that she knew of the risk and her response to the risk was unreasonable? Again, assuming that he was ordered to carry these bags? I think that's a much stronger case in the case we have present. Okay, thank you. He was not ordered to carry the bags. I just wanted to be clear in terms of the knowledge and the response and whether or not, again, if those if the facts line up, if the elements would be satisfied in your responses in that hypothetical, which might be true, that element would have been satisfied. But once again, it I'm sorry, yes or no, in this hypothetical, which might actually be true, would that element be satisfied? I have that was a much stronger case. Yes. I think it's a stronger case, but we still have to have the causation. We still have to have all these other elements. No, I understand that. But if we're going element by element in terms of that element, saying it's a stronger case, I will take that as yes. And as to his verified complaints that were filed earlier, as you as you receiving verified complaints still puts forth factual allegations with evidentiary value. So those should not be ignored. Additionally, we did have a custodian of the records lay out which work passes he had for which states and that record, there was not a pass that said about the carrying 15 pounds. So there might be a medical document from June 11th that said about the 15 pounds, but it doesn't have an expiration date. Additionally, as to the carrying generalities are not material facts. And so making these broad allegations and his fourth complaint that Miss Pratt ordered him to carry these bags without any dates, that is not sufficient for alleging a material about sitting on the garbage can, because it's also been said that there is evidence to support that a that Miss Pratt ordered him to sit on the garbage can be that it caused him to fall and inherently caused him pain given his condition. And see that that was known and D, that even even working in this field was sort of contrary to his medical pass. And he shouldn't have been working in any of this stuff because of his medical pass. Does that not meet the elements underway, assuming the record shows that? No, the medical pass, he said he wasn't supposed to stand for more than 15 minutes. And at no point is he alleged that he was made to stand for more than 15 minutes. Now, while the trash can might be an inappropriate seats and that's a disputed fact that would be viewed in light of favor to Miss West, the fact that he if he had to sit on a trash can, that is not in itself a constitutional violation. He was not made. So would be your I mean, certainly like sitting on a trash can is not inherently that. But if sitting on a trash can causes you pain and you know that it causes you pain and you order someone to do it anyway. Is that not a little closer to what we're talking about under the Eighth Amendment? So this is a case where we have some has arthritis in their knee and their toe and the complaints and even the inmates who filed the affidavits, they state that he had a swollen leg. He walked with a limp. He had a cane. So none of those things would put someone on notice that sitting on a trash can would cause pain to a knee or to a toe. So in that sense, no, I don't think sitting on the trash can is enough of a violation or deprivation to get us to a constitutional violation. What if you're told, hey, listen, I just can't do it. It's causing me tremendous pain. I'm falling that the falls are causing my knee and my my feet to flare up at that point. Does it not cause an issue? You know, he went to the medical, saw nurses and doctors during this time frequently. And when he went to there, he never once made an allegation, saying this trash can is hurting my back, my knee. You know what I'm talking about? What Ms. Spratt may or may not have known based on the record in light, most favorable to your opposing counsel. What Ms. Spratt knew is that he could not stand and he was not made to stand. Thank you, counsel. Thank you. Does the court have any questions related to the service issue of Ms. Schultz? I think you've heard all the questions we have. Thank you. Thank you, counsel. May it please the court, my name is Sarah Medina and I represent, I represent Wexford for the summary judgment argument and individual Wexford doctor defendants for the waiver argument. We are respectfully requesting that this court affirm the judgment of the district court. Based on the evidence before this court, this is a difference of medical opinion case. This is not a failure to provide treatment case or delay of treatment case. It is undisputed that appellant was repeatedly evaluated, treated and properly diagnosed with degenerative osteoarthritis. And after being evaluated and treated, appellant wanted additional treatment. Specifically, appellant wanted an MRI and to be seen by a specialist. His requests were denied by his treating physicians. Let me separate this out for a second. So what you have here is a motion to dismiss. And this may be something that you want to bring up in terms of preservation. But you have the motion to dismiss with regard to the individual Wexford providers, we'll call them. And then you have the company, which is reviewed and has a summary judgment. So in looking at the complaint, then it's the operative complaint here is the fourth complaint, I believe, the one that I referred to earlier. That complaint does, as I understand it, have allegations which suggests that decisions were made based on cost. Does it or does it not have those allegations? It has allegations that are just that allegation, but it also I'm not saying it's truth, but those are allegations. And for the Wexford providers, that that's the way we we review that in the light most favorable to to the plaintiff here. And so what do we make of those allegations when determining that? Yes, you're right that that there are some allegations would suggest that this is a medical dispute. But then you have statements by providers that are put into the into the complaint, which suggests, hey, I'm not providing the services because Wexford won't let us. Are there policies that say, are we we're not allowed to order this or something to that effect? Well, your honor, based off the Fourth Amendment complaint, right, do you have to state a cause of action, a plausible cause of action? And based off his allegations, he very clearly said he was treated and properly diagnosed and repeatedly provided x-rays and care. All that's true. All that is true, which is why there's that other part that we're talking about. And so I want you to address that other part, which is I wasn't ordered this other stuff because of I'm not allowed to because of cost. And then you go to the Wexford issue, which is, you know, not yet because we're still talking about the complaint and the complaint. If the providers aren't providing services based on on non-medical reasons, then doesn't that create under our case law an issue under the Eighth Amendment? Your honor, respectfully, no. As he was as he expressed in his complaint that he was it was not medically indicated that he needed an MRI based off the attachment attachments, his x-rays and his radiologists report expressed that if follow up care, if it was medically indicated, they could have provided an MRI. But it wasn't the problem is you're bleeding the summary judgment record into the complaint and the complaint. All we really have are just the allegations and then some records that are attached to it. And for that, yes, the doctor said, you know, there's some indication that he was provided all of this stuff and the medical records may indicate not that. But there's also indications that more wasn't provided because the doctors were saying that I'm not allowed to because of these policies. Does that not create under our case law and your opposing counsel cites it in their brief case law, which suggests that where you make medical decisions based on financial reasons as opposed to medical reasons, that gets into the deliberate indifference category. It does for the Wexford argument as if the providers were, you know, their hands were tied based off what they were provided, then you have to determine whether there was an unconstitutional policy and policy in place by Wexford. But how can a doctor if the defense to the doctor and the complaint is I provided medical services and it's just the medical dispute. Then then it's particularly relevant for the provider him or herself to say, I'm not giving this extra service, not because I don't think it's medically necessary, but because I am not allowed to under this policy. A part of the Supreme Court case, but still, it's clear that a dispute, whether or not a diagnostic treatment of further diagnostic treatment is needed is a difference of medical opinion. So here we have a case where he is. We will provide a treatment and he was upset about the treatment he received, but it does not mean he wasn't, you know, adequately treated or cared for, but it doesn't necessarily mean that. But then he additionally alleges, which is not in Estelle and I'm asking it. This takes it out of Estelle under our own case law where the reason you're not providing the additional services is not because of a medical dispute, but because of something else. Some some financial reason. Right, Your Honor, I I see your point. However, I there's a distinction between whether I'm making a point. I'm asking a question. Doesn't our case law say that I respectfully disagree, Your Honor, as there is a distinction between the Wexford defendants and deliberate indifference in that aspect and the policy, which is either unconstitutional or you have to prove a pattern in practice. And based off the allegations, it's clear that the Wexford defendants treated Mr. West and if there was an unconstitutional policy in place that prohibited him from receiving treatment, he has to prove a policy and practice via Wexford. Well, so maybe if you give us or give me some latitude, an undisputed fact is that Wexford is a company that is in the business of making money. Correct. And that even though it provides these services to prisons, which are not lucrative businesses in and of themselves, the goal is to provide these services to these correctional institutions to make money, providing a medical service that is extremely expensive does not further Wexford's financial goals, another, let's say, undisputed fact. So you have someone like Mr. West, who, as you described, or I think your co-counsel described, had extensive medical issues already documented in his record. There's no debate. It sounds like that an MRI would have at least helped to further understand his condition, but it wasn't provided and it wasn't provided in the context of Wexford looking at the financial costs of business and making those decisions. Why does that not equate to, at least for purposes of circumstantial evidence, which Judge Jordan emphasizes in the concurrence to Wade, why is that not something to be considered as part of a policy and practice that harmed Mr. West? Well, you have in McDowell, a budget decision alone would make, even though it would make a constitutional violation more likely, that alone cannot say that it produced that specific violation. So even though there is a budget consideration, of course, you cannot say that one equals another without providing evidence, which is why Wexford's motion to dismiss was denied. And that's why we're here for motion for summary judgment versus the Wexford defendants based off Brennan. I mean, Farmer Brennan and Wade versus McDade. Based off the allegations of the complaint, it was they responded reasonably to the risk of what he was presenting them with. So he and also Perestel that a diagnostic tech technique or further diagnostic tests are the sole discretion of those medical providers. So you have the motion to dismiss that was granted for the Wexford doctor defendants properly by the district court. And then you have the motion for summary judgment for Wexford based off the policy. And that's why we're here. Didn't we say in Anaconda and C.A.T.A. that if medically if necessary, medical treatment has been delayed for nonmedical reasons, a case of deliberate indifference has been made out. That is correct. However, in this case, your honor, there was no medical indication that he needed an M.R.I. Perestel. But that's not the question. The question is, was treatment made for nonmedical reasons, whether he needed it or not, is is separate and apart from that. It may happen that he didn't need it. But if if the decision was made for nonmedical reasons, is that not deliberate indifference? I'm running out of time. May I answer? Yeah, go ahead and answer that. Of course, if it was medically indicated and they needed treatment and that was denied, that is a different story. And yes, that would be an option for an Eighth Amendment violation. However, would it rise to the level of an Eighth Amendment violation or medical malpractice as Perestel? That's, that's the issue here. Does it even rise to an Eighth Amendment violation? Thank you. Thank you.  Hello again. So I have two points on rebuttal. And of course, first, I'll address your questions. So Mr. West swore to his original complaint and his first amended complaint. That's Dock 1 and Dock 21. The sworn complaints are amended. They're superseded for pleading purposes, but not for evidentiary value at summary judgment. And that's where we're at with the Monell claim. What what case law do you have that supports that that position that you're you're articulating? I've never heard of that. You're right, Your Honor. This comes from Goodman v. Diggs. That's 936. You've been there. It's the operative complaint, I believe. Right. Isn't it the operative complaint that's sworn? And I agree with you. If the fourth amended complaint was verified, then that could serve absolutely as evidentiary basis without any additional summary judgment. But Judge Lagoa's question, and I have the same one, is have we do we ever have a case where the complaint had been superseded? The complaint is null, but yet that is served. And without a notice to the court, hey, go back and look at my complaint 1 and complaint 2 as my affidavit, that that is summary judgment evidence that the court had to consider. I think perhaps where I'm getting stuck is the the documents that I've been referencing or was referencing at the time of this question are his sworn affidavits, not an amended complaint. And the case law that I jotted down for that is Savovia and Goodman. So the affidavits which were sworn to. I'm just not sure the affidavits which I've read have the same level of detail and allegations that the first and second complaints have, which is why I think you relied on the first and second complaints as part of the summary judgment record and laying that out to us. This I think that might be part of the issue here. The sworn documents are three, the sworn affidavits rather are 300-1 and or perhaps just 300 but definitely 299-1. So it's massive sort of documents of complaints or of, excuse me, of his sworn statements. And just briefly to address the subject of his time in food service once more, he specifically stated in these sworn statements that Spratt would order to lift and carry the bags of zucchini, knowing he used a cane and would go and get security and State West is refusing to work and was well aware of the medical passes because they were constantly shown to her. That's 299-1 at 119. And in regards to the, do you mind if I finish? Go ahead and wrap up, please. In regards to the trash can claim, she perhaps did believe that this was a suitable accommodation when she assigned him to chopping the vegetables. But as your honor, as I believe noted, this was not a suitable accommodation because he was in excruciating pain. And in fact, Assistant Warden Williams and Nurse LaRosa both confirmed that for an inmate like Mr. West with a no standing pass, this was not an appropriate seat. Thank you, counsel. Counsel will note that you've taken this case pro bono. We're very appreciative of the efforts of the Georgetown Abella Clinic. It's been a privilege to be here. Thank you so much.